**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JHOVONNE TAYLOR for T.J.T., | ) | CASE NO. 5:14-CV-2704 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Jhovonne Taylor ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Commissioner of Social Security ("the Commissioner"), denying the

application of Plaintiff's daughter, T.J.T. ("Claimant"), for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to the consent of the parties

entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On July 7, 2011, Plaintiff filed an application for SSI on behalf of Claimant

alleging a disability onset date of June 1, 2001.  (Transcript ("Tr.") 19, 27, 151.)  The

application was denied initially and upon reconsideration, and Plaintiff requested a

hearing before an administrative law judge ("ALJ"). (*Id.*)  On June 28, 2013, an ALJ

conducted Claimant's hearing.  (*Id.*)  Claimant was represented by an attorney.  (*Id.*)

On August 27, 2013, the ALJ found Claimant not disabled. (Tr. 38.)  On November 3,

2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1-6.)

On December 11, 2014, Plaintiff filed a complaint on behalf of Claimant, a minor, challenging the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15, 16.)

Plaintiff asserts the following assignments of error: (1) the ALJ erred in finding that Claimant did not meet Listing 112.05 or, alternatively, did not have marked impairments in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others; (2) the ALJ erred in relying on the opinions of the state agency reviewing physicians and psychologists; and (3) the ALJ erred in discrediting Plaintiff's testimony.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Claimant was born in December 2000, and was a school-age child on the date her application was filed and on the date of the administrative hearing. (Tr. 30.) Claimant had not engaged in substantial gainful activity at any time relevant to the disposition of her application.  (*Id*.)

### B.    Medical Evidence and School Reports

On August 16, 2010, Trevor Bullock, D.O, treated Claimant due to concerns over behavioral issues, which included hitting and yelling at smaller children, a short attention span, and failing to follow directions. (Tr. 337.)  Dr. Bullock noted that Claimant did her homework when she was told and did "well" when she applied herself.

2

(*Id.*)  The doctor instructed Plaintiff to seek counseling for Claimant's anger issues and to return forms that would help determine if Claimant had attention deficit hyperactivity disorder (ADHD). (*Id.*)

Claimant returned to Dr. Bullock on November 17, 2010. (Tr. 335.)  Plaintiff had not returned the forms for ADHD. (*Id.*)  Since Claimant's last visit, she had been placed in an ADHD class and her grades had improved. (*Id.*)  She achieved mostly A's, B's, and C's, and had recently received an award at school for her grades. (*Id.*)  Plaintiff reported that Claimant was doing well with her homework. (*Id.*)  Claimant told Dr. Bullock that she felt more focused and her new class was a better learning environment. (*Id.*)  Claimant was working with a behavioral counselor. (*Id.*)

Around May 31, 2011, school psychologist Brad Falkenberg, Ph.D., conducted an evaluation of Claimant as part of an Evaluation Team Report (ETR). (Tr. 286-301.)  Dr. Falkenberg noted that in June 2008, Claimant had qualified for special education services due to a learning disability. (Tr. 287.)  In 2008, Claimant was tested using the Wechsler Intelligence Scale for Children (WISC-IV) and obtained a full scale IQ score of 73, verbal comprehension and perceptual reasoning scores of 77, and a working memory score of 65. (*Id.*)  These results showed that Claimant's intellectual abilities were within the borderline range. (*Id.*)   In 2008, in addition to learning disabilities, Plaintiff also exhibited hyperactivity, verbal and physical aggression, somatization, inattention, and poor study and social skills. (*Id.*)  Dr. Falkenberg noted that Claimant had stopped attending speech services due to success, but continued to receive special  instruction in reading, writing, and math. (Tr. 287.)

3

Dr. Falkenberg additionally recounted the results of Claimant's intellectual testing on the WISC-IV administered in May 2011. (Tr. 291.)  He reported that during the test, Claimant had exhibited poor work habits, often voiced complaints, exhibited a lack of consistent effort, worked very quickly, was fidgety, refused to try some basic math and spelling items, tried to write on the dry erase board, made wild guesses on some word problems just to be finished, and was careless. (*Id.*)  As a result, the psychologist warned that the results of the test "must be interpreted with caution." (*Id.*)  Claimant obtained a full scale I.Q. of 66, which was in the extremely low range of functioning. (Tr. 291, 302.) She had a verbal comprehension index score of 65, in the extremely low range of functioning, and a perceptual reasoning index score of 75, in the borderline range. (*Id.*)  Claimant's working memory score was in the extremely low range, but her processing speed score was average for children her age. (*Id.*)  Dr. Falkenberg cautioned that the validity of the current test results could be suspect, explaining that the results "should be interpreted with caution due to inattentive, impulsive, and sometimes uncooperative behaviors exhibited during the assessment." (Tr. 292, 296.)

In May 2011, Claimant also took the Woodcock-Johnson Psychoeducational Battery (WJ-III). (Tr. 293.)  Dr. Falkenberg indicated that "as previously alluded to, all WJ-III results should be interpreted with caution due to careless work habits, inattentive and impulsive behavior, and a lack of concern for accuracy." (Tr. 293.)  The test showed that Claimant's academic skills were in the extremely low range in all areas, including basic reading, math, spelling, and writing. (*Id.*)

Along with intellectual testing, Dr. Falkenberg considered reports from Claimant's teachers, which indicated that Claimant usually completed her homework, but seldom

4

finished classroom work in math. (Tr. 289.)  One teacher noted that Claimant had made large strides in paying attention, following directions, and completing work. (*Id.*) Claimant, however, still acted immature and was easily distracted. (*Id.*)  Dr. Falkenberg observed that despite special instruction, Claimant remained well below grade level in all subjects. (*Id.*) Teachers also indicated that when taking a test, Claimant's reading skills were so poor that she "just cop[ied] from the test" rather than answer the questions. (Tr. 290.)  During the past two school years, Claimant violated the behavior code three times, resulting in one in-school and one out-of-school suspension. (Tr. 289.)

Dr. Falkenberg recommended that Claimant continue to receive regular support from an intervention specialist in reading, language arts, and math. (Tr. 297.)  Claimant would also benefit from intervention targeting her behavioral and social-emotional needs that could be obtained through community counseling and structuring the classroom to address these issues. (*Id.*)  Dr. Falkenberg opined that Claimant was not mentally retarded or emotionally disturbed. (Tr. 299.)  He concluded that her poorly developed skills in reading, writing, and math appeared to be adversely impacting her performance across the curriculum. (*Id.*)  Her inattentive, impulsive, and immature behaviors negatively affected her academic performance, but the psychologist believed they were secondary to learning disabilities. (*Id.*)

On her fourth grade report card, Claimant received D's in math, but B's and C's in all other subjects. (Tr. 361.)  Prior school transcripts showed that Claimant received primarily D's in the third grade, but A's, B's, and C's in the second grade. (Tr. 362.)

On November 30, 2011, Colin Drolshagen, M.D., completed a medical source opinion form addressing Claimant's functioning.[1] (Tr. 353.)  He wrote that Claimant had eczema and a learning impairment, but no psychological impairment as of an October 2011 evaluation. (*Id.*)  Claimant was not taking medication. (*Id.*)  With regard to acquiring and using information, the doctor noted that Claimant performed below average in school, despite being enrolled in an individualized education program. (*Id.*)  As to attending and completing tasks, Dr. Drolshagen stated that Claimant had "trouble staying still." (*Id.*)  Under interacting and relating with others, the doctor reported that Claimant had interacted appropriately at her last appointment. (*Id.*)

In April 2012, Claimant received an updated individualized education program (IEP). (Tr. 207-21.)  The program report indicated that Claimant had "done well" since arriving at a new school in January 2012. (Tr. 209.)  She had adjusted to her new classroom and made positive peer relationships. (*Id.*)  Claimant's classroom teacher described Claimant as a quiet student who attempted to do all work given to her. (*Id.*)  An intervention specialist indicated that Claimant worked hard when assignments interested her, but could be noncompliant when she found work difficult or unenjoyable. (*Id.*)  Although Claimant was in the fifth grade, her scores on standardized tests in the areas of reading, math, language, and science showed that she performed at the second grade level. (*Id.*)  The IEP also indicated that Claimant took the WJ-III in 2011 and scored in the very low range in reading and math. (Tr. 212-13.)  Claimant, however, was currently receiving an A in her modified reading curriculum and a B in her modified

---

[1]     On the form, Dr. Drolshagen did not indicate what degree of impairment Claimant exhibited in the domains.

math curriculum. (*Id.*)

On January 10, 2013, Dennette Waters completed a teacher questionnaire in which she described Claimant's functioning. (Tr. 226-33.)  Ms. Waters was Claimant's intervention specialist, who provided assistance in language arts and math. (Tr. 226.)  Ms. Waters had known Claimant for four months. (*Id.*)   Ms. Waters opined that Claimant had a "serious" to "very serious" problem[2] with regard to every activity in the domain of acquiring and using information. (Tr. 227.)  She explained that Claimant received help in all classes from adult or peer tutors and that directions needed to be read to Claimant several times with step-by-step delivery. (*Id.*)  If left by herself to complete assignments, Claimant would "simply copy words from a book or text." (*Id.*).  Ms. Waters indicated that Claimant had a number of serious and very serious problems in the domain of attending and completing tasks. (Tr. 228.)  Ms. Waters again explained that Claimant generally pulled "passages from the text to complete assignments." (*Id.*)  Claimant also needed to be refocused constantly and rarely completed tasks, even with extra time. (*Id.*)  With regard to interacting and relating with others, Ms. Waters endorsed mostly serious to very serious problems. (Tr. 229.)  Claimant was "easily influenced, especially by her cousin." (*Id.*)  Claimant was normally respectful, but there were times when she was disrespectful and refused to participate in activities. (*Id.*)

In April 2013, Ms. Waters completed a second teacher questionnaire. (Tr. 269-74.)  Unlike her prior report, Ms. Waters opined that Claimant had only "slight" to

---

[2]     The teacher questionnaire included a rating key with the following range of ratings: no problem, a slight problem, an obvious problem, a serious problem, a very serious problem. (Tr. 227.)

"obvious" problems with acquiring and using information, apart from one "serious" problem in the activity of expressing ideas in writing. (Tr. 270.)  Ms. Waters explained that Claimant's performance was inconsistent and she exhibited behavior problems, which prevented her from performing academic tasks. (*Id.*)  Claimant also fought help when it was offered. (*Id.*)  Ms. Waters indicated that Claimant had problems of mixed severity with regard to attending and completing tasks and interacting and relating with others. (Tr. 271-72.)

On her 2013 report card, Claimant received C's and D's in language arts as well as a D in math. (Tr. 235.)  She had B's and A's in science, health, physical education, and music. (*Id.*)

## C.    State Agency Reports

On October 13, 2011, consultative examiner Joseph Perry, Ph.D. performed a psychiatric examination of Claimant. (Tr. 347-50.)  At the time, Claimant was ten-years-old and in the fifth grade. (Tr. 347-48.)  Plaintiff reported her concerns about Claimant's behavioral and learning problems. (Tr. 347.)  She also reported that Claimant had symptoms of ADHD, but had never been diagnosed with the condition by a medical professional. (*Id.*)  Plaintiff explained that Claimant had learning difficulties, received special education services since the first grade, and had difficulty focusing and concentrating. (*Id.*)  According to Plaintiff, Claimant's school attendance had been excellent and her grades were satisfactory with her adjusted curriculum. (Tr. 348.)

Dr. Perry wrote that during a mental status examination, Claimant did not exhibit difficulty with attention or focus. (Tr. 348.)  In addition, Claimant had no difficulties with

8

speech and provided relevant responses in a clear, coherent fashion; had no symptoms of mood disorders; exhibited no anxiety; and her word knowledge was at an average level. (*Id.*)  Claimant had below average short-term auditory memory for digits, but satisfactory auditory memory for words. (*Id.*)  In terms of activities of daily living, Claimant was assigned chores and needed reminders to do them. (*Id.*)  She could pour drinks, prepare cereal, make a sandwich, and dress herself. (*Id.*).  Claimant enjoyed playing with dolls, reading, riding her bicycle, and watching television. (*Id.*)  She got along with immediate family and had several friends. (*Id.*)

Dr. Perry opined that Claimant did not present remarkable symptoms for diagnoses of learning or mental health conditions. (Tr. 349.)  He diagnosed no mental impairments and assigned a Global Assessment of Functioning (GAF) score of 70.[3] With regard to Claimant's functioning, Dr. Perry issued the following opinions:

- Acquiring and using information:  Claimant functioned with an average range of intellectual ability during the mental status examination, evidencing average vocabulary and general language skills.  While Plaintiff's reports that Claimant received tutoring at school for learning problems would suggest a below average ability in this domain, no specific information regarding Claimant's academic progress was available to confirm Plaintiff's report. (Tr. 349.)

- Attending and completing tasks: Claimant had no limitations.  During the examination, Claimant had no unusual problems with focus,

---

[3]      The GAF scale rates an individual's overall psychological functioning from 0 for inadequate information to 100 for superior functioning. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). A GAF score between 61 and 70 represents some mild symptoms or some difficulty in social or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

concentration, attention, or persistence.  She had not received mental health services and took no psychotropic medications. (*Id.*)

• Interacting and relating with others: Claimant had no limitations.  She evidenced no problems when interacting with the examiner.  She could be aggressive with her sister, but had friends in the community and at school. Claimant had no reported remarkable behavior problems at school that required services for students with social behavioral problems. (Tr. 350.)

At the beginning of November 2011, state agency pediatrician Louis Goorey, M.D., and psychologist Melanie Bergsten, Ph.D., reviewed the record. (Tr. 93-95.)  They opined that Claimant had a less than marked limitation in acquiring and using information, attending and completing tasks, and health and physical well-being. (Tr. 93-94.)  Drs. Goorey and Bergsten found that Claimant had no limitations in interacting and relating with others. (Tr. 94.)

At the end of January 2012, state agency pediatrician Rachel Rosenfeld, M.D., and psychologist Robyn Hoffman, Ph.D., conducted a second review of the record. (Tr. 104-06.)  They concluded that Claimant exhibited less than marked limitations in the domain of interacting and relating with others. (*Id.*)  Their assessment otherwise affirmed Drs. Goorey and Bergensten's opinions.

**D.    Plaintiff's Hearing Testimony**

During the administrative hearing, Plaintiff testified that the Claimant had memory problems. (Tr. 55-56.)  Claimant also had issues interacting with students at school, and had been disciplined for throwing rocks, along with her cousin, at other students. (Tr. 56-57, 63.)  Some time after the rock throwing incident, Claimant transferred schools to be separated from her cousin. (Tr. 63-64.)  Claimant had bullied a kindergarten student. (Tr. 57.)

10

At home, Claimant fought with her three siblings, but not with her mother. (Tr. 57.) She shared a room with her younger sister, and they got along off-and-on. (Tr. 62.) Claimant struggled to complete her homework and became easily frustrated. (Tr. 58.) Claimant's friends at school were negative behavioral influences. (Tr. 59-60.)  Outside of school, Claimant interacted with only her siblings. (Tr. 60.)

At the time of the hearing, Claimant was not receiving medical treatment because her "doctor just switched." (Tr. 60.)  Before the change in physicians, Claimant had not received treatment because medical providers had not recommended any. (*Id.*) Claimant had not seen a doctor in approximately one year. (*Id.*)  When asked why Claimant had not received medical care in the past year in light of her problems at school, Plaintiff responded, "I have no idea." (Tr. 62.)

### III.   STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled if he has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002) (per curiam).  There is a three-step analysis for determining whether a child-claimant is disabled.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Second, if the child is not engaged in substantial gainful activity, the Commissioner must determine whether the

child suffers impairments or a combination of impairments that are "severe" and that are expected to result in death or have lasted or are expected to last for a continuous period of not less than 12 months.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine, 37 F. App'x at 148*.  Third, if the child suffers a severe impairment or combination of impairments that meet the Act's durational requirement, the Commissioner must determine whether they meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine, 37 F. App'x at 148*.  If the child's severe impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the Listings, the child will be found disabled.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine, 37 F. App'x at 148*.

To determine whether a child's impairment functionally equals the Listings, the Commissioner assesses the functional limitations caused by the impairment in six domains of functioning:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

12

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant was born on December 6, 2000.  Therefore, she was a school-age child on July 7, 2011, the date the application was filed, and is currently a school-age child.

2.    The claimant has not engaged in substantial gainful activity since July 7, 2011, the application date.

3.    The claimant has the following severe impairments: borderline intellectual functioning and learning disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1.

5.    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6.    The claimant has not been disabled, as defined in the Social Security Act, since July 7, 2011, the date the application was filed.

(Tr. 30-37.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the

13

evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

    **B.**      **Plaintiff's Assignments of Error**

           **1.**      **Whether the ALJ Erred in Finding that Claimant Failed to Meet, Medically Equal, or Functionally Equal a Listed Impairment**

           **2.**      **Whether the ALJ Erred in Discrediting Plaintiff's Testimony**

Plaintiff argues the ALJ erred in finding that Claimant's impairments did not meet or equal Listing 112.05, the listing for intellectual disability.  Plaintiff also maintains that the ALJ erred in concluding that Claimant did not have marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.  Plaintiff contends that the ALJ improperly discounted her credibility and that this affected the ALJ's determination that Claimant did not have marked limitations.  As these assignments of error are interrelated, they will be discussed together.  For the following reasons, Plaintiff's allegations of error are not well taken.

14

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)).  An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment. *Id.* at 415; *Hunter v. Astrue*, No. 1:09-cv-2790, 2011 WL 6440762, at *3 (N.D. Ohio Dec. 20, 2011); *May v. Astrue*, No. 4:10-cv-1533, 2011 WL 3490186, at *8-9 (N.D. Ohio June 1, 2011).  Nevertheless, it is the claimant's burden to show that he meets or medically equals an impairment in the Listings. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987) (per curiam).

To meet the level of severity required by Listing 112.05, a claimant must satisfy at least one of six criteria set out in sections 112.05(A) through (E) *and* must have significantly subaverage general intellectual functioning with deficits in adaptive functioning. 20 C.F.R Part 404, Subpart P, Appendix 1, 112.05.  Plaintiff contends that Claimant meets the requirements of subsection 112.05(E).  Under 112.05(E), based on her age, Claimant must show a valid verbal, performance, or full scale I.Q. of 60 through 70. 20 C.F.R. Part 404, Subpart P, Appendix 1, 112.05(E).  For an accurate assessment under Listing 112.05, I.Q. test results must be sufficiently current. 20 C.F.R. Part 404, Subpart P, Appendix 1. Test results obtained between ages 7 and 16 should be considered current for two years when the I.Q. is 40 or above. *Id.*  Finally, a

claimant must demonstrate a marked limitation in one of the following areas: social functioning; personal functioning; or maintaining concentration, persistence, or pace. 20 C.F.R. Part 404, Subpart P, Appendix 1, 112.02(B)(2)(b)-(d), 112.05(E)(2).

Here, Plaintiff argues that the ALJ did not consider Claimant's full scale I.Q. score of 66 from testing conducted in May 2011.  According to Plaintiff, the I.Q. score meets the requirement of the Listing.  The Commissioner counters that this I.Q. score would not have been considered "valid," as the Listing necessitates.  The Commissioner points to Dr. Falkenberg's statement that the May 2011 score should be interpreted "with caution" due to Claimant's uncooperative behavior during the test. (Tr. 292, 296.)  While there may be grounds to find that the May 2011 I.Q. score was invalid, the ALJ did not make a finding about the validity of the score nor did he discuss the score in his opinion. "[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) (citation omitted)).

Even if the ALJ erred with regard to Claimant's I.Q. score, the error would be harmless unless Plaintiff can show that the ALJ erred in finding that Claimant did not have a marked limitation in social functioning; personal functioning; or maintaining concentration, persistence, or pace.  To establish marked limitations is these areas, Plaintiff cites to the opinions of school intervention specialist Ms. Waters and Plaintiff's

16

testimony.[4]  Plaintiff relies on this same evidence to support her argument that Claimant had marked limitations in the functional domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.  The ALJ, however, adequately assessed Ms. Waters' opinions and Plaintiff's testimony, and reasonably discounted their opinions as there was substantial contradictory evidence in the record.

With regard to opinions and other evidence from educational personnel, like Ms. Waters, Social Security Ruling (S.S.R.) 06-3p explains:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

S.S.R. 06-03p, 2006 WL 2329939, at *6 (S.S.A.).  Because Ms. Waters was an "other source," the ALJ was required only to consider the teacher's opinion and to ensure that

---

[4]    Plaintiff also cites to discrete pieces of evidence, including a sixth grade report card (Tr. 235.), a sixth grade discipline record (Tr. 236.), and a school psychologist's assessment that teacher responses were "clinically significant" for inattention (Tr. 314.)  This evidence is not sufficient to establish marked limitations.  Even if this evidence constituted substantial evidence of marked limitations, remand would not be necessary, as the ALJ cited to substantial evidence showing less than marked limitations, which will be discussed further in this opinion. *See Ealy*, 594 F.3d at 512 ("If the Commissioner's decision is based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion.").

his discussion of the evidence allows the Court to follow his reasoning.  A review of the

ALJ's decision indicates that the ALJ considered and discussed Ms. Waters' opinions.

(Tr. 32.)  Additionally, the ALJ's opinion shows that the ALJ relied more heavily upon

medical sources in the record, specifically, consultative psychological examiner Dr.

Perry and the state agency reviewing psychologists and physicians. (*Id.*)  These

sources contradicted Ms. Waters' opinions[5]  and found that Claimant did not exhibit

marked limitations in any of the functional domains. (Tr. 349-50, 93-95, 104-06.)  In

addition, as the ALJ indicated, the state agency reviewers concluded that Claimant did

not meet the severity of the Listing. (Tr. 30, 93-95, 104-06.)  Contrary to Plaintiff's

argument, educational personnel are not entitled to the deference accorded to treating

physicians.  The ALJ was not required to provide good reasons for rejecting Ms.

Waters' opinion or further elaborate upon his decision.  No treating source in the record

opined that Claimant had marked limitations and the ALJ's opinion in this regard is

substantially supported.

Even if this Court were to assume that Plaintiff's testimony would support a

finding of a marked limitation, it would not affect the outcome of this case as the ALJ

did not find Plaintiff completely credible and provided adequate reasons for discrediting

---

[5]     Plaintiff concedes that Ms. Waters' second report, issued in April 2013,
changed from her earlier January 2013 opinion and noted only one
serious problem in the domain of acquiring and using information.
(Plaintiff's Reply Brief at 2.)  Thus, Ms. Waters' April 2013 opinion
regarding Claimant's ability to acquire and use information actually
coincides with the ALJ's and the state agency medical sources'
conclusion that Claimant was not markedly limited in this particular
domain.  Plaintiff also maintains that Ms. Waters' opinions demonstrate
marked limitations in attending and completing tasks and interacting and
relating with others.

her statements.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  *See Siterlet v. Sec'y of Health & Human Servs., 823 F.2d 918, 920 (6th Cir. 1987); Villarreal v. Sec'y of Health & Human Servs., 818 F.2d 461, 463 (6th Cir. 1987)*.  However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  *See Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 249 (6th Cir. 2007); Weaver v. Sec'y of Health & Human Servs., 722 F.2d 313, 312 (6th Cir. 1983)*.  The ALJ also must provide an adequate explanation for his credibility determination.  The determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).

Here, the ALJ's opinion included specific reasons for finding that Plaintiff's testimony was not fully credible as to the intensity, persistence, and limiting effects of Claimant's alleged symptoms.  These reasons included:

- The unexplained gap in Claimant's medical treatment.  Specifically, the ALJ highlighted Plaintiff's inability to explain why the Claimant had not received any medical treatment for the entire year preceding the administrative hearing. (Tr. 31.)

- The inconsistency between the Claimant's level of activity and interaction and the degree Plaintiff claimed.  For example, the ALJ recounted Plaintiff's testimony that Claimant did not get along with others and did not have friends. (Tr. 31.)  However, the ALJ observed that the evidence showed Claimant shared a room with her sister; played with her four siblings; spent time with her cousin, though her cousin's influence on Claimant's behavior was at times inappropriate; and enjoyed playing

hopscotch and basketball.[6] (*Id*.)

- The contradiction between Plaintiff's statements that Claimant had a short attention span and problems with learning, and the fact that Claimant had never been diagnosed with or treated for ADHD. (Tr. 31-32.)

Moreover, even if Plaintiff did provide evidence to support her argument of marked limitations, the existence of such evidence alone would not be an appropriate reason to reverse the ALJ's decision: An ALJ's decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512. Other portions of the ALJ's opinion[7] provide substantial support for the ALJ's conclusion that Claimant did not have marked limitations:

- The ALJ assessed that Claimant engaged in a range of activities without issue: she had no sleep problems, attended school daily, completed household chores with reminders, could fix herself a snack and dress herself, looked at books, and rode a bicycle. (Tr. 32.)

- The ALJ observed that following a psychological examination, Dr. Perry did not advance a diagnosis of any disorder for Claimant. (Tr. 32.) Dr. Perry opined that Claimant had no difficulty with concentration, persistence, and attention; interacting with others; or self-care. (*Id*.)

---

[6]    Although Plaintiff challenges the conclusions that the ALJ draws from Claimant's activities, the ALJ was not unreasonable in drawing such conclusions and evaluating how the evidence shed light on Claimant's functional limitations.

[7]    The ALJ's explanation under the Listing and the domains was not elaborate, but the ALJ's opinion, taken as a whole, evaluates the evidence and indicates the weight the ALJ gave it. Before evaluating the domains, the ALJ provided a discussion of the testimony, medical evidence, and school records. (Tr. 31-33.) The ALJ's discussion of the evidence was not merely a rote recitation of Claimant's longitudinal history; rather, the ALJ analyzed the evidence and explained how it supported his ultimate disability determination. (*Id*.) This affords the Court the opportunity to meaningfully review the ALJ's opinion.

20

• The ALJ explained that Claimant's treating physician Dr. Drolshagen observed that Claimant followed commands and interacted appropriately. (Tr. 32.)  Although Dr. Drolshagen stated that Claimant exhibited some hyperactivity, the ALJ noted that Claimant had not received treatment for ADHD. (*Id.*)

• The ALJ observed that Claimant was able to achieve grades in school that ranged from below average to above average. (Tr. 33.)  As her sixth grade report card reflected, Claimant received D's and C's in some classes, but B's and A's in other courses. (Tr. 235.)  When Claimant was in the fifth grade, she achieved an A and a B in her modified curriculum reading and math classes. (Tr. 211-12.)  On her fourth grade report card, Claimant had D's in math, but B's and C's in all other subjects. (Tr. 361.)

Had the ALJ discussed the aforementioned evidence while making the Listing determination, within his analysis of the individual domains, or immediately following his statement that Plaintiff's testimony was not entirely credibly, there would be no question that the ALJ provided substantial support for his findings. The fact that the ALJ did not analyze this evidence in multiple sections of his opinion, or refer back to this evidence, does not necessitate remand of Claimant's case. "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766, n.6 (1969)).  Accordingly, Plaintiff has not presented a basis for remand based on the ALJ's listing, functional equivalence, or credibility analyses and conclusions.

21

### 3.     Whether the ALJ Erred in Relying on the Opinions of the State Agency Reviewing Physicians and Psychologists

In January 2012, state agency physician Dr. Rosenfeld and psychologist Dr. Hoffman opined that Claimant had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 104-06.)  The ALJ assigned great weight to these portions of Drs. Rosenfeld and Hoffman's opinions. (Tr. 32-33.)

Plaintiff maintains that the ALJ erred in giving great weight to Drs. Rosenfeld and Hoffman's opinions because the record was incomplete at the time they rendered their opinions.  Specifically, Plaintiff argues that the reviewers "did not have the benefit of seeing any of the evidence added to the record subsequent to their opinions, which included [Ms. Waters'] teacher assessment form, subsequent school testing (Tr. 207-221), and behavior reports. (Tr. 279-81.)" (Plaintiff's Brief at 14.)  Plaintiff's argument is without merit.

Plaintiff has failed to provide any legal support for her argument that the ALJ could not properly rely on the opinions of Drs. Rosenfeld and Hoffman because the record was not complete at the time they rendered their opinions.  The responsibility for deciding functional equivalence rests with the ALJ. *See* 20 C.F.R. 416.926a(n).  Here, the ALJ determined Claimant's functional equivalence while considering the opinions of examining and non-examining medical sources, teacher reports, school records, and Plaintiff and Claimant's testimony, and included evidence that developed after the

reviewers issued their opinions, including Ms. Waters' reports.[8] (Tr. 31-35.) Accordingly,

substantial evidence supports the ALJ's determination.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

<u>s/ *Nancy A. Vecchiarelli*</u>
U.S. Magistrate Judge

Date: October 5, 2015

---

[8]    Ms. Waters is an "other source," whose opinion was entitled to no special deference.  The ALJ's decision showed that the ALJ discounted Ms. Waters' opinions because there was contradictory evidence in the record.

23